UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

_____
                                         :
IN RE:                                   :
ALEXANDER CHICKOSKY and                  :          CHAPTER 12
MAURINE CHICKOSKY,                       :
                                         :          CASE NO. 12-20562 (ASD)
        DEBTORS.                         :
                                         :          RE: ECF NO. 84
                                         :
_____            :
                                         :
IN RE:                                   :          CHAPTER 12
ENFIELD SHADE TOBACCO, LLC,              :
                                         :          CASE NO. 12-21324 (ASD)
        DEBTOR.                          :
                                         :
                                         :          RE: ECF NO. 40
_____:
_____

APPEARANCES:

Anthony S. Novak, Esq.                      Attorney for Debtors
Novak Law Office, P.C.,
280 Adams Street
Manchester, CT 06042-1975

Thomas C. Boscarino, Esq.                   Chapter 12 Trustee
Boscarino, Grasso & Twachtman
628 Hebron Avenue, Building 2
Suite 301
Glastonbury, CT 06033

Tara L. Trifon, Esq.                        Attorneys for Farm Credit
James D. McGinley, Esq.                     East, ACA f/k/a First Pioneer
Edwards Wildman Palmer LLP,                 Farm Credit, ACA
20 Church Street, 20th Floor
Hartford, CT 06103
_____

**MEMORANDUM OF DECISION
ON OBJECTION TO CONFIRMATION OF DEBTORS'
SECOND AMENDED CHAPTER 12 PLANS
AND
AND ORDER DENYING CONFIRMATION**

ALBERT S. DABROWSKI, Chief United States Bankruptcy judge

## I. INTRODUCTION

On March 14, 2012, Alexander K. and Maurine D. Chickosky (hereinafter, the "Chickoskys", or together with Enfield Shade Tobacco, LLC, the "Debtors") filed a voluntary petition under Chapter 12 of the United States Bankruptcy Code.  On May 30, 2012, Enfield Shade Tobacco, LLC (hereinafter "Enfield Shade") filed its own voluntary petition under Chapter 12 of the Bankruptcy Code.  On July 30, 2012, this Court granted the Chickoskys' *Amended Motion for Joint Administration,* ECF No. 57, and Enfield Shade's *Motion for Joint Administration*, ECF No. 28.  Thomas C. Boscarino was appointed as the Chapter 12 Trustee (hereinafter, the "Trustee" ) as to both estates, ECF No. 6 (the Chickoskys) and ECF No. 8 (Enfield Shade).

Before the Court for its consideration and determination is whether the Debtors' Joint Second Amended Chapter 12 Plan (hereinafter, the "Plan"), ECF No. 84 (Chickosky) and ECF No. 40 (Enfield Shade) should be confirmed, to which Farm Credit East ACA, f/k/a First Pioneer Farm Credit, ACA (hereinafter, "Farm Credit") objects.  A contested hearing to consider confirmation of the Plan (hereinafter the "Confirmation Hearing") was held on April 2, 2013.

The Court has jurisdiction over this matter under 28 U.S.C. §1334, and this is a core proceeding under 28 U.S.C. §157(b)(2)(L).  The following shall constitute findings of fact and conclusions of law under Federal Rules of Bankruptcy Procedure 7052 and 9014.

## II. BACKGROUND AND FACTS

The Chickoskys are family farmers who own two adjacent real estate parcels at 132 and 128 Moody Road, Enfield, Connecticut. The parcel at 132 Moody Road consists of

2

2.35 acres improved by a four-bedroom residence, which is their principal residence (hereinafter, the "Residential Property"). Approximately one acre is utilized for growing crops. The parcel at 128 Moody Road (hereinafter, the "Farm Property") consists of 37.2 acres improved by four tobacco sheds, a greenhouse range shop and equipment shed, a small office building and a 5,000 sq. ft. 50-man labor camp. Of the 37.2 acres, 22 acres are utilized for growing crops. The Farm Property has historically been cultivated with Connecticut Valley shade tobacco and/or broadleaf tobacco. Enfield Shade, in which the Chickoskys have sole and equal ownership interests, owns the equipment, the 2008 tobacco crop, and machinery used by both Debtors in the farming operations. The Debtors and/or their predecessors have been engaged in the farming business for approximately fifty years,[1] although until the last several years, the Debtor, Alexander Chickosky, was also employed full-time as an airline pilot for Delta Airlines, from which he is now retired.

Over the past several decades, the Chickoskys have faced difficulties in operating their Farm Property profitably. In 1985, a Chapter 11 bankruptcy was filed for Chickosky Farms, Inc., a now inactive entity in which the Chickoskys have a 100% interest. Thereafter, between the years 1992 to 1998, the Chickoskys and Chickosky Farms, Inc., filed two Chapter 11 bankruptcy petitions each, only one of which resulted in a confirmed Chapter 11 Plan, *In re Alexander K. Chickosky and Maurine D. Chickosky*, Case No. 93-50660. Between the years 2005 and 2009, the Debtors faced other difficulties, including limited access to markets (apparently related to litigation concerning a failed joint venture), weather problems, and tobacco crop diseases. The Debtors lost money on their farming

---

[1]At some point in the past, the Farm Property was owned by another party and was leased by the Chickoskys. It was bought back in 2004.

operations during the years 2008 through 2011, making a profit only in 2007, while breaking even in 2006. As a consequence, the Debtors were unable to stay current on both their long term and short term debt obligations.  The last large tobacco crop was cultivated in 2008, most of which crop, more than 18 tons, was processed and remains on the Farm Property.

To increase farm revenues, the Debtors now grow, raise, process and manufacture tobacco on the Farm Property. In 2011, the Debtors commenced the business of manufacturing small cigars (cigarillos) using a leased cigar rolling machine on the Farm Property under the name of "Regal Palm," to which they own the trademark, utilizing the 2008 tobacco crop.  As of the date of the Confirmation Hearing held on April 2, 2013, Enfield Shade also had agreements with H. & M. Laziza, LLC (hereinafter, "H & M") a Florida company, to supply it with cigarillos that the Florida company would then resell under its own name (as well as a lesser amount of tobacco strips); agreements with two other companies for the sale of Regal Palm; and an agreement with Leaf Only for the bulk sale of smaller amounts of raw, unprocessed tobacco. The Debtors also plant and raise tobacco for sale on the open market and plant and raise grain crops, including corn. They derive some income from the rental of a small portion of their property.

Since 2009, the Debtors have made no regular payments on their debt to their principal secured creditor, Farm Credit, the first mortgage holder on both the Residential and Farm Properties, evidenced by four promissory notes, the first made in 2004, plus a first lien position on Enfield Shade's equipment, machinery and 2008 tobacco crop.  As a consequence of the Debtors' failure to make the required payments, Farm Credit commenced a foreclosure proceeding on the Farm Property and sought to replevin all of

4

the personalty owned by Enfield Shade, including tractors, plows, seeders, spreaders and other farm equipment and machinery.

According to the proofs of claim filed in the Chickosky and Enfield Shade bankruptcies, the outstanding balance due Farm Credit at the time of the filing of the Chickoskys' petition was $2,507,739.70 and at the time of the filing of Enfield Shade's petition was $2,514,517.80.   The Debtors calculate the balance on the notes on the Chickosky petition date to be $2,276,422.49. The notes and mortgages are cross-collateralized against both the Residential Property and Farm Property and against Enfield Shade's farm equipment and machinery and by the 2008 tobacco crop.

Subsequent to the filing of the petitions, on June 19, 2012, the Court entered an Order of Adequate Protection, ECF No. 44, requiring the Chickoskys to make monthly payments of $1,250 to Farm Credit which they have made since that date.  On October 2, 2012, the Court conducted an evidentiary hearing under Bankruptcy Code §506 and Fed. R. Bankr. P. 3012 concerning the value of the Residential and Farm Properties.  By *Order Determining Status of Liens Pursuant to Section 506* (hereinafter, the "§506 Order"), ECF No. 68 (Chickosky), dated November 16, 2012, the value of the Residential Property was established as $256,500 and the value of the Farm Property at $800,000, and the Court further determined that the claim of Farm Credit should be treated as secured by both properties in the amount of $1,031,431.07 and unsecured in the amount of all remaining balances.

Although the relevant bankruptcy cases are merely administratively consolidated, the Debtors have filed a joint Plan which will be considered for confirmation as if they have

filed two identical but separate Plans.[2]  The Debtors filed two prior joint Chapter 12 Plans,

to which in the Chickosky case,[3] Farm Credit filed objections, ECF Nos. 50, 54 and 78, with

the last entitled, *Opposition of Farm Credit East, ACA to Motion of Joint Debtors to Confirm*

*Amended Chapter 12 Plan*.  Farm Credit did not file a formal written objection to the

Debtors' current Plan, apparently because the Plan was only filed at Court at 5:41 P.M.,

on April 1, 2013, the evening before the Confirmation Hearing on the earlier filed First

Amended Plan.[4]  In light of the short notice to Farm Credit of the Debtors filing of the Plan,

the Court will treat Farm Credit's earlier filed objections that remain relevant and the verbal

objections raised at the Confirmation Hearing as if they had been properly filed in a formal

written objection to the Plan now under consideration.[5]

Following the Confirmation Hearing, the Debtors filed on April 23, 2013, a *Joint*

*Debtors' Memorandum in Support of Confirmation* . . . , (hereinafter, "Joint Debtors'

Memo"),  ECF No. 88 (Chickosky), and ECF No. 41 (Enfield Shade).  On May 7, 2013,

Farm Credit filed a *Reply Memorandum of Farm Credit East, ACA, to Motion of Joint*

*Debtors to Confirm* . . . , ECF No. 89 (Chickosky).  Thereafter, on May 21, 2013, the

Trustee filed *a Chapter 12 Trustee's Statement of Position Relative to Confirmation of*

*Debtors' Second Amended Chapter 12 Plan as Modified Upon the Record* (hereinafter,

---

[2]Nevertheless, when discussing the Plans herein, they will be referred to in the singular for
simplicity purposes.

[3]Farm Credit only filed one objection in the Enfield Shade case, ECF No. 25.

[4]Bankruptcy Code §1223(a) and (b) in relevant part, allow a debtor to modify the plan at any time
before confirmation and the plan as modified becomes the plan.

[5]Bankruptcy Code §1223(c) provides in relevant part, "Any holder of a secured claim that has
accepted or rejected the plan is deemed to have accepted or rejected, as the case may be, the plan as
modified. . . ."

"Chapter 12 Trustee's Statement"), ECF No. 90 (Chickosky), and ECF No. 42 (Enfield Shade).  On June 12, 2013, Farm Credit filed *a Statement of Farm Credit East, ACA in Response to Chapter 12 Trustee's Statement of Position,* ECF No. 91 (Chickosky)*; and on June 13, 2013, the Debtors filed *Debtors' Reply to Statement of Farm Credit East, ACA, . . . and Chapter 12 Trustee's Statement of Position . . .* (hereinafter, the "Debtor's Reply")*, ECF No. 92 (Chickosky) and ECF No. 43 (Enfield Shade).

## A.   *The Debtors' Plan*

### 1.   *Proposed Treatment of Creditors*

The Debtors' Plan in relevant part, is reasonably straightforward.  With respect to the Residential Property, the Plan provides for the cramdown of the amount the Debtors owe to Farm Credit to the value of the property that is secured, namely $247,038.00[6], with a modified mortgage for a term of thirty years at 4% interest, payable outside the Plan at the rate of $1,179.40 a month.  The Plan eliminates the cross-collateralization of the secured debt on the Residential Property with the assets of the Farm Property and Enfield Shade.  Likewise, with respect to the Farm Property, the Plan provides for the cramdown of the amount the Debtors owe to Farm Credit to the value of the property that is secured, namely $784,393.00[7] with a modified mortgage for a term of thirty years with 4% interest, payable outside the Plan in the amount of $3,744.82 a month.  It also eliminates the cross-

---

[6]The $247,038 secured value of the debt was arrived at by taking the Court's §506 Order which determined that the fair market value of the Residential Property was $256,500, and reducing it by the $9,462.79 prior-in-right tax liens of the town of Enfield, CT (hereinafter, the "Enfield Residential Tax Liens").

[7]The $784,393 secured value of the debt was arrived at by taking the Court's §506 Order which determined that the fair market value of the Farm Property was $800,000, and reducing it by the $15,606.14 prior-in-right tax liens of the town of Enfield, CT (hereinafter, the "Enfield Farm Tax Liens").

collateralization of the secured debt on the Farm Property with the assets of the Residential Property and Enfield Shade.  Finally, the Plan provides that all existing notes and mortgages held by Farm Credit on both the Farm and Residential Properties will be extinguished, the remaining balances deemed undersecured and paid *pro rata* with unsecured creditors, as dealt with elsewhere in the Plan.

With respect Farm Credit's security interest in Enfield Shade's farm equipment and machinery (at present cross-collateralized by the Residential and Farm Properties), the Plan proposes to cramdown the debt to $147,900.00, which amount the Debtors represent is equal to the value assigned to the personal property by Farm Credit in an *Amended Motion for Relief From Stay,* ECF No. 32, it filed in the Enfield Shade case and pay the debt outside the Plan in a modified mortgage for a term of ten years with 5.4% interest, in the amount of $1,597.79 a month.  The Plan again eliminates the cross-collateralization of the debts.  There is no specific mention therein as to how the Debtors' presumed use and sale of the 2008 tobacco crop which Farm Credit has at times valued as high as $383,552.00, will affect Farm Credit's security interest in the crop.

Additionally, the Plan provides for monthly payments to the Trustee of no less than $2,300.00 over a period of sixty (60) months, to be distributed to creditors as follows: payments totaling $10,000.00 in satisfaction of the balance of Debtors' attorney's fees; payment of other outstanding priority claims in full (not fully identified); payment of Enfield Residential Tax Liens and Farm Tax Liens of $25,068.93 at the rate of $634.00 a month plus statutory interest of 18% over sixty (60) months and payment of monthly dividends of $1,417.00 to unsecured creditors over sixty (60) months, which the Debtors estimate will

8

represent payment of about 5% of unsecured claims totaling 1.4 million dollars.[8]  Outside the Plan, the Debtors intend to maintain payments on: (1) the cigarillo rolling machine in the amount of $984.00 a month[9], (2) the secured debt of $8,598.54 owed to American Eagle Federal Credit Union with respect to a 2003 Ford Thunderbird (although the payments are missing from the Chickoskys' budget on Plan Exh. C, Farm Credit's Confirmation Hearing Exh.1), and (3) the secured debt of $6,604.41 owed to USAA Federal Savings Bank with respect to a 2000 Harley-Davidson Road King Motorcycle in the amount of $202.00 a month.  None of these creditors filed objections to confirmation of the Plan or to earlier versions thereof.

While the Plan indicates that the Debtors owe $19,136.44 to the USDA-Farm Service Agency (hereinafter, the "USDA") which is the remaining balance on a $100,000 loan secured by liens on the Debtors' 2009 crops as well as by its farm equipment and machinery, the Debtors represent therein that the USDA no longer has any security in the 2009 crop since it was harvested and sold without payment to the USDA.  The Debtors also assert that since the USDA's lien on the farm equipment and machinery is secondary to that of Farm Credit, its lien is entirely unsecured.  Nevertheless, the Debtors represent in the Plan that they have an insurance claim pending with respect to the 2009 crop in the amount of $19,136.44, which if recovered, will be turned over to the USDA.  After payment

---

[8]At the Confirmation Hearing, the Debtors made additional "concessions" when examined by the Chapter 12 Trustee, including confirming that the Plan will require that all of their disposable income during the Plan's five year term will be paid over to the Trustee for the benefit of unsecured creditors. They also agreed to further amend the Plan by putting into the confirmation order language providing that if the Debtors should receive money from the Connecticut Farm Preservation Program they would use it to reduce their Farm Credit indebtedness, and, assuming their ability to alter the terms of the loan repayments, would apply the excess income to their unsecured creditors.

[9]The Debtors claim that the lease is not a "true lease" but a sale secured by the assets of the Debtors.

of the insurance proceeds, if any, the Plan also provides that any remaining balance on the USDA claim will be treated as unsecured and paid *pro rata* with other unsecured creditors.

As with the USDA, the Debtors indicate in the Plan that although a $25,250 loan for fertilizer and other supplies made by Helena Lending Services, LLC (hereinafter, "Helena") to Enfield Shade was partially secured by Enfield Shade's interest in the 2010 tobacco crop, as well as by its equipment and machinery, the crop was sold or otherwise disposed of without payment to Helena. Likewise, since its lien on the farm equipment and machinery is subsequent to that of Farm Credit (and possibly to that of the USDA), the Plan treats the lien as entirely unsecured and provides for the debt to be paid *pro rata* with other unsecured creditors.[10]

### 2.    The Debtors' Projected Income and Expenses

According to Exh. C of the Debtors' Plan (also Farm Credit's Exh.1),[11] entitled, "Alexander and Maurine Chickosky Estimated Statement of Income for the Year Ended December 31, 2013" (with successive pages reporting income and expenses for each year thereafter through April 2018) (hereinafter, the "Chickosky Projected Income Statements"), the Chickoskys project total income of $68,783 for the eight-month period running from May through December 2013. The income consists of Mr. Chickosky's annual retirement pension from Delta Airlines of $34,119, annual Social Security retirement income for both Chickoskys of $25,464 and annual income from rental of an apartment, a shed and a

---

[10]Neither Helena nor the USDA has objected to confirmation for lack of good faith or on any other ground. *See Barger v. Hayes County Non-Stock Co-op (In re Barger)*, 233 B.R. 80, 84 (8th Cir. BAP 1999).

[11]Although the Court only administratively consolidated the Chickosky and Enfield Shade's cases, the Plan provides that net income from Enfield Shade is intended to be used to make Plan payments on behalf of both Debtors.

storage space totaling $9,200, as prorated.  After payment of personal expenses, they report anticipated net personal income of $31,990 for the eight months of 2013.  For each of the next five years, the Chickoskys project annual income for 2014 of $100,942 with net income after personal expenses of $41,126; annual income for 2015 of $101,722, with net income after personal expenses of $41,323; annual income for 2016 of $102,514 with net income after personal expenses of $40,922; and annual income for 2017 of $103,330, with net income after personal expenses of $42,626.  For 2018, using figures only for the months of January through April, the Chickoskys project income of $34,443, with net income after personal expenses, estimated at $12,635.

Beginning in 2013, the Chickoskys also include in their calculations an estimated 2% rise in Social Security, matched by a 2% increase in expenses, and from 2014 onward, a decrease in income derived from storage rental.  However, the Chickosky Projected Income Statements also indicate that once certain projected expenses related to the farm operations such as the Plan-adjusted mortgage obligations, real estate taxes (under the Plan and postpetition), payments to unsecured creditors and Chapter 12 Trustee fees are factored in, rather than having net income, the Chickoskys will face significant losses, estimated to be about $61,000 for each full year going forward.  Thus, in order for the Chickoskys to both live and pay their Plan indebtedness, they will be forced to depend heavily on anticipated profits derived from the Enfield Shade farming operations.

According to the Projected Income Statement for Enfield Shade, entitled on the first page, "Enfield Shade Tobacco, LLC Estimated Statement of Income for the Year Ended December 31, 2013" (with successive pages reporting income and expenses for each year thereafter through April 2018) (hereinafter, the "Enfield Shade Projected Income

Statements"), Enfield Shade projects income for the months of May through December 2013 totaling $190,000 (assuming an increase of 5% in sales from the year before and each year thereafter), said income consisting of sales of cigars, "roll your own" cigars, bulk sales and sales of grain corn.  After payment of expenses (projecting an increase of 2% from the year before and each year thereafter), it anticipates net income from operations of $31,990 for the months of May through December 2013. For each of the next five years, Enfield Shade projects annual income for 2014 of $293,133 with net income from operations after expenses of $88,254; for 2015, annual income of $303,526, with net income from operations after expenses of $97,877; for 2016, annual income of $314,402 with net income from operations after expenses of $104,895; and for 2017, annual income of $325,783 with net income from operations after expenses of $103,384.  For 2018, using only figures for January through April, Enfield Shade projects income of $110,557, with net income from operations after expenses over the same period, projected at $56,344.  The expenses include the Plan-mandated farm equipment loan repayment.  The income and expense projections will, according to the Debtors, require the use of the Chickoskys' entire 37.2 acres of land with improvements, and all of Enfield Shade's machinery and equipment.

In sum, it is clear that in order for the requirements of the Plan to be met, at minimum, net income derived from the farming operations, including tobacco sales attributed to Enfield Shade, will need to be used to pay both Enfield Shade's and the Chickoskys' budgeted expenses.  Thus, unless Enfield Shade meets its income goals, the Plan will fail.

### 3. *Objection to Confirmation of Debtors' Chapter 12 Plan*

Farm Credit has made a number of arguments in support of its objection to

12

confirmation of the Debtors' Plan.   Primarily, Farm Credit argues that the Plan is not feasible, based upon the Debtors' past financial history, their present revenues and what Farm Credit maintains are unrealistic projections for the future. Secondly, Farm Credit argues that the Plan's elimination of its cross-collateralization violates Bankruptcy Code §1225(a)(5)(B) and is neither justified nor warranted.   Thirdly, Farm Credit argues that the Debtors' proposed treatment of its claims, is not fair and reasonable within the meaning of Bankruptcy Code §1225(a)(5)(B)(ii) in that the value, as of the effective date of the Plan, of the property to be distributed by the Trustee is less than the allowed amount of its claim. In particular, it maintains that the proposed 30 year repayment period for the debt on the Residential Property and Farm Property makes the loan too risky in light of the proposed100% financing, and therefore, the proposed interest rate of 4% is below market. Similarly, Farm Credit argues that the ten-year term proposed for the repayment of Enfield Shade's debt is too high and the interest rate of 5.4% too low in light of the age and nature of the collateral, the significant risk of non-repayment, and the 100% financing.

### III. DISCUSSION

**A.   *Whether the Debtors' Plan is Feasible***

"Chapter 12, which is modeled after Chapter 13, was enacted 'in response to the agricultural debt crisis of the mid-1980s,' *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1990), and 'was intended to enable family farmers to retain their farms while reorganizing their financial affairs.' *In re Lockard*, 234 B.R. 484, 490 (Bankr. W.D. Mo. 1999)."   *In re Hudson*, Case No. 208-09480, 2011 Bankr. LEXIS 1010 *9 (Bankr. M.D. Tenn. March 15, 2011).

Among the requirements for confirmation of a Chapter 12 plan, Bankruptcy Code

§1225(a)(6) requires the court to find that the debtor is able to make all payments under the

plan and to comply with the plan's terms.  Thus, the court must be able to review all of the

financial evidence presented by the debtor, and render a considered opinion as to whether

he has met his burden of establishing a reasonable probability of the plan's success. *In re*

*Ellis* 478 B.R. 132, 139 (Bankr. N.D.N.Y. 2012) ("Debtor has the burden to establish all of

the elements essential to confirmation of the Plan").

> "Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." *In re Howard*, 212 B.R. 864, 878 (Bankr. E.D. Tenn. 1997) (citation omitted). In determining whether a plan is feasible, the Court must consider the proposed plan payments in the context of the projected income and expenses to determine whether the debtors are likely to be able to make all proposed payments required under their amended plan. *In re Elk Creek Salers, Ltd.*, 286 B.R. 387, 396 (Bankr. W.D. Mo. 2002) (citation omitted).
> The plan must be realistic, and the debtors bear the burden of proving that they will be able to perform what they are proposing under the plan. *In re Howard*, 212 B.R. at 880 (citation omitted). When deciding whether the debtors have met this burden, the Court must take into account that "the purpose of Chapter 12 is to promote the reorganization attempts of family farmers," and that "courts generally give debtors the benefit of the doubt on the issue of feasibility, provided a reasonable probability of success is established." *In re Lockard*, 234 B.R. 484, 492 (citation omitted).

*In re Hudson*, 2011 Bankr. LEXIS 1010, at *19.

Thus, while a debtor is not required to guarantee the success of the plan, the debtor

nevertheless, must,

> provide a reasonable assurance that the plan can be effectuated (citation omitted). However, this reasonable assurance must rise above "bare agronomic feasibility." *In re Crowley*, 85 B.R. 76, 79 (W.D. Wis. 1988). The *Crowley* court stated that "such a technical agronomical feasibility determination generally includes a variety of assumptions and the likelihood that these assumptions will occur must be determined by the Court."

*In re Stallings*, 290 B.R. 777, 791 (Bankr. D. Idaho 2003) *quoting Miller v. Nauman (In re*

*Nauman*), 213 B.R. 355, 358 (9th Cir. B.A.P. 1997).

14

At the Confirmation Hearing, the Debtors introduced evidence intended to establish that notwithstanding their not having been entirely successful in the past, having shifted over the past several years from only growing and harvesting tobacco and corn to the "value added" component of the manufacture and sale of cigarillos and roll your own tobacco, has greatly increased their likelihood of success.   As support, the Debtors introduced into evidence a sample package of their Royal Palm Cigarillos as Debtors' Confirmation Hearing Exh. A; invoices worth $20,941.39 in sales of product to their customers for the month of January 2013, invoices worth $18,392.18 for the month of February 2013, and invoices worth $33,658.75 for the month of March 2013 (Debtors' Confirmation Hearing Exhs. B and H); copies of wire transfers of funds and one check from H & M over that same period totaling $29,706.00, and copies of two checks from a customer, Leaf Only, one for $1,230.25 dated January 9, 2013 and the other for $1,200.00 dated March 6, 2013 (Debtors' Confirmation Hearing Exh. C).

Alexander Chickosky testified at the Confirmation Hearing that such documentary evidence showed that sales were significantly increasing in 2013 over prior years and that such increases supported his belief that sales would continue to increase upward. Notwithstanding his testimony, no evidence was presented to correlate the invoices and the payments to determine if the payments related to sales made during periods of the invoices or prior thereto.   For example, one invoice dated January 6, 2013, billed to H & M, included an interest charge and indicated thereon that the debt was over 30 days.   Another invoice dated January 23, 2013, indicating sales for that month of $15,313.70, included therein a previous balance of $6,242.29, with no indication if the sale actually occurred in January.

Neither did the Debtors introduce any cash flow statements or income statements

15

prepared over that same 90-day time period to put the sales into perspective.  Without any

indications as to the costs involved in producing the product, and other expenses incurred

during that time period, it is impossible to determine if the sales produced a profit for the

Debtors.  Thus, the Debtors' Confirmation Hearing exhibits only served to establish the fact

that sales of tobacco-related products were ongoing and as a whole, increased over the

course of those three months.  Alexander Chickosky was the only witness testifying for the

Debtors.  There was no independent evidence from either an expert in farming operations

or in its financing or from a new customer to substantiate his claims that the relatively new

operations were likely to be long-lasting and thus able to support the ambitious five-year

Plan proposed by the Debtors.  Mr. Chickosky testified that the projections of income and

expenses were primarily based upon his own past experience and recent sales figures

although he testified that he did speak to his vendors and several other "experts."

Nevertheless, the projections for 2013 assume that the Debtors' income from "value added"

sales will remain constant for the rest of the year.  As of the date of the Confirmation

Hearing (April 2, 2013), the Debtors had not filed their 2012 tax returns but Mr. Chickosky

guessed that Enfield Shade's  gross income for that year would be somewhere between

$150,000 and $160,000.  Thus, his projections for 2013 anticipate an increase in the

Debtors' gross income by more than $95,000 (taking the 8-month total projection of

$190,400 and extending the monthly average over a 12-month period) and in 2014, his

projection of gross income of $293,133, is an amount almost double that of 2012.

Projections based upon three or four months of results, particularly ones that are not

adequately supported by financial data, are not sufficiently reliable for purposes of

confirming the Plan.

16

Keith Stechschulte, a loan officer and office manager for Farm Credit with 16 years experience in making farm loans, including to a majority of the tobacco farmers in the Connecticut River Valley, testified on behalf of Farm Credit and disagreed with Mr. Chickosky's projections of expenses for tobacco and grain corn.  With respect to the 2014 projections of expenses for Enfield Shade he stated (based in part on his own expense models), that the Debtors' estimate of approximately $44,500 in yearly costs of growing 10 acres of broadleaf tobacco was way too low – that it should be closer to $100,000 ($10,000 an acre).  While he agreed there could be a slight adjustment for the Chickoskys' doing much of the labor themselves, he said that from his experience, the most efficient tobacco farmers' costs are at least $6,000 an acre, or $60,000 for 10 acres.  He did not consider the Chickoskys anywhere close to being among the most efficient and stated that based on the years in which he last received figures, 2007-2008, their expenses were approximately $13,000 an acre, or $130,000 for 10 acres.   He also testified that based upon his experience, rather than the $500 in costs per acre projected by the Chickoskys for the growing of corn on 12 acres, the costs would be closer to $700 to $800 per acre.

The Debtors introduced as Confirmation Hearing Exh. E, a Tobacco Products Sales Agreement (hereinafter, the "Agreement") entered into between Enfield Shade and H & M, dated August 29, 2012.  The Agreement was for a term of one year from the date of signing, subject to automatic renewal unless a month prior to the expiration date, one party notified the other of its decision to terminate the Agreement.  The terms of the Agreement were very loose.  While the Agreement provided for an initial price for each unit of 32 cents, it was

17

subject to a weekly revision upon Enfield Shade so notifying H & M.[12]  Likewise, while the

Agreement provided that Enfield Shade would commit to making available to H & M up to

10,000 small cigars a week, H & M only had to advise Enfield Shade as to how many were

needed for any particular week.  H & M was not required to purchase a minimal level of

cigars nor to buy exclusively from Enfield Shade.  The Agreement actually went into effect

on November 20, 2012, after H & M received approval from the TTB to enter into the

Agreement.[13]  *See* Debtors' Confirmation Hearing Exh. F.

In the Chapter 12 Trustee's Statement, filed on May 21, 2013, following the

Confirmation Hearing, the Trustee asked the Debtors to confirm "that there has been no

significant diminution in the business relations between the Debtors and its recently

established customer H & M. . . ."  Farm Credit joined in that request.   In the Debtors'

Reply, filed by the Debtors on June 13, 2013, they declined to supply any additional

information on this point or any other.  ("The Debtors object to any extension or reopening

of the factual record which was established on April 2, 2013, as such record is closed  . .

. [T]he existing record is adequate for the court to confirm the proposed plan").[14]  While

there was no requirement for the Debtor to supply additional information, it would have been

---

[12]In fact, as of the date of the Confirmation Hearing, the price had dropped to 25 cents a unit.  The existing Agreement does not set a ceiling or a floor on prices.

[13]The Agreement was subject to the approval of the Alcohol and Tobacco Tax and Trade Bureau, U.S. Dept. of the Treasury (otherwise known as the TTB).

[14]The Trustee was generally ambivalent in his position as to whether the Debtors' Plan should be confirmed.  In summary however, he stated that notwithstanding his view that the Plan was a "high risk" plan, he would support confirmation conditioned upon the Debtors, (1) filing an affidavit indicating that the Debtors' contractual relationship with H & M remains strong, (2) modifying the Plan to modestly increase the interest paid on Farm Credit debt and (3) reducing the secured indebtedness by selling off certain under-utilized equipment and machinery.  As previously noted, the Debtors have not agreed to meet those conditions.

in the Debtors interest to do so in light of the Debtors placing such heavy reliance in establishing the Plan's feasibility on a one-year Agreement and the revenues received over basically a three-month period.  It is therefore impossible for the Court to do anything more than speculate as to whether this Agreement, so critical to the Debtors' financial future, is being renewed for another year or whether the terms of any new Agreement are sufficiently favorable to the Debtors.

Further, even if the Agreement is renewed, the fact that as presently drafted it does not require H & M to purchase any minimum amount of tobacco product and is nonexclusive, means that the level of purchases that occurred over the past months give no assurance for the future.  Thus, the Debtors' reliance on future purchases to match those of the January to March 2013 period as reflected in the Enfield Shade Projected Income Statements for the next five years, not being based upon prior years levels of earnings and based upon no significant binding commitments for more than a few months, are unreliable.

Moreover, since neither the Chickoskys nor Enfield Shade have filed any monthly operating reports (hereinafter, "Operating Reports") during the eighteen months they have been in bankruptcy[15] the Court has neither information as to what their revenues and expenses have been over the entire period since their filing nor whether they have generated any profits.  Operating Reports, if showing a positive cash flow, could have been used by the Debtors to support their projections (or conversely, might have refuted them).

---

[15]Bankruptcy Code §704(a)(8) as made applicable to Chapter 12 debtors by Bankruptcy Code §§1203 and 1106(a)(1), requires debtors to file "periodic reports and summaries of the operation of such business[es]."  In the Chapter 12 Trustee's Statement, he asked the Court to require the Debtors to commit to filing such reports.

*See In re Chambers*, Case No. 08-31399, 2008 Bankr. LEXIS 3937, at *22 -27 (Bankr. E.D. Tenn. November 20, 2008) (wherein the court used the debtor's current operating reports to evaluate the debtors' projections).

Further, had the Debtors been filing Operating Reports, the concerns expressed by the Chapter 12 Trustee as to the Debtors' volume of sales to H&M in the months following the Confirmation Hearing would have been answered. The Debtors have offered no evidence to establish that they have sufficient cash on hand available to make Plan payments should the Plan be confirmed. The absence of Operating Reports, also makes it impossible to determine if the projected revenues set forth on the Projected Income Statements for the months of May, June or July 2013 were, in fact, realistic and as such could have served as a bellwether for the next five years.

In considering a Chapter 12 plan's feasibility, courts often rely to a great extent on the debtor's past performance, particularly if recent financial information is not sufficiently determinative:

> The projections and expenses should be based on the debtor's past experience as supplemented by current market information.
> In analyzing the debtor's income projections, the court should examine whether they are consistent with the debtor's prepetition performance. Are the projected crop yields reasonable based on past crop yields? Are projected expenses consistent with historical expenses?

Collier on Bankruptcy P 1225.02[5] (16th ed. 2013) (hereinafter, "Collier at ___"); *In re Foertsch,* 167 B.R. 555, 566 (Bankr.D.N.D. 1994) ("In assessing the feasibility of the Debtors' Plan, the court finds the historical financial data of the Debtors' operation to be highly instructive, especially when measured against the projections under the Plan"); *In re Stallings*, 290 B.R. at 791 (*quoting In re Nauman*, 213 B.R. at 358. ("Because past behavior

20

and productivity are excellent indicators of future productivity, courts have frequently rejected plans which are premised on highly optimistic projections of increased production"). Here, the Debtors' past history of repeated losses, increased indebtedness and multiple bankruptcies do not support the prospects of the Debtors' success going forward.  In fact, the Debtors' historical performance suggests the opposite.

The Debtors' projections assume a 2% increase in Social Security each year matched by a 2% increase in expenses.  However, over the past five years, the amount of increases in Social Security have been very irregular.  In 2009, the increase was 5.8%; in 2010, it  was 0%; in 2011 again 0%; in 2012 it was 3.6% and in 2013, it was 1.7%.[16] Therefore, although the 2% projection may represent a reasonable historical average, since the increases are based upon an increase in the Consumer Price Index (October 1 through September 30 of the prior year), there is no assurance that there will be any increases over the next five years or if there are, how much they will be.  Likewise, while the Debtors project an increase in sales of 5% each year over the life of the Plan for Enfield Shade Tobacco, that number is shear speculation, since the Debtors lack a recent past history demonstrating that their expectation of such an increase is reasonable.  Projections for increases in farming revenues can be particularly speculative since so many of the variables, including weather and crop disease, are totally beyond the control of the farmer. In this case, the Debtors' projections anticipate increases in revenue for each of the years of the Debtors' operations under the Plan, notwithstanding recent past history in which the Debtors had more bad years than good.

Further, the Debtors have presented inadequate evidence to support their belief that

---

[16] *See* www.ssa.gov/cola/automatic-cola.htm

they will have the ability to make the required expenditures of funds in advance of harvest to obtain supplies, to plant the crops, or pay their workers.  "For most farming operations this will entail a monthly cash flow showing the *timing of receipts and expenditures* and indicating the debtor's ability to service the debtor's anticipated operating expenses and to make the required plan payments" (emphasis added), Collier at P 1225.02[5].  The Debtors' projections here show only the slightest of differences in income or expenses over the twelve months of the year, regardless of the nature of the crop grown, harvested or sold.[17] Mr. Chickosky testified that he expected to be able to fund his future operations (absent new contracts that do not now exist) on the basis of increasing revenues from H & M. However, as discussed previously, the Debtors lack an adequate track record for such reliance to be considered reasonable.

While the Debtors raise the possibility in their Plan at para. VI. ¶4 of selling off development rights to the state of Connecticut (hereinafter, the "State") there is no indication that this proposition is anything more than speculation.  Although the Debtors have been in Chapter 12 for a year and a half, within that time period no application has been submitted to the State.  Nor is it clear that the funding for such a program presently exists, allowing for a sale to take place any time in the near future.  Thus, the possibility of a sale of development rights cannot be factored into the feasibility equation as realistic.

**B.**    ***Whether the Debtors May Eliminate the Cross-Collateralization of the Farm Credit Debt Through Confirmation of The Plan***

---

[17]Mr. Chickosky testified that corn grain, for example, is generally sold during December but not throughout the rest of the year, as is tobacco.  Mr. Chickosky also testified that the projections were "flatlined" by his accountant and that they were not accurate in that respect.  He also testified that he intended to correct the projections, but in the six months since the Confirmation Hearing, no amendments to the Enfield Shade Projected Income Statements have been filed.

Although not stated plainly, the Debtors' Plan intends to eliminate the cross-collateralization of Farm Credit's debt among the Chickoskys' Residential Property, the Farm Property and Enfield Shade's farm equipment and machinery. The proposed treatment of Farm Credit's existing first mortgage and four promissory notes in section C of the Plan provides that Farm Credit shall retain modified mortgages on the properties, in each case equal only to the $247,038 net value of the Residential Property and the $784,394 net value of the Farm Property (after having subtracted the outstanding Enfield Residential Tax Liens and Enfield Farm Tax Liens as to each).  Notably, it ignores the language in the §506 Order whereby the Court found that Farm Credit's claim "shall be treated as secured by both properties in the amount of $1,031,431.07. . . ."  It instead states, "[i]t being the intent and purpose of this Plan that all mortgages and promissory notes due under the existing mortgage of Farm Credit be extinguished and the modified mortgages as set forth above be substituted for the original mortgage and notes." As it concerns Farm Credit's secured claim on the farm equipment and machinery,[18] the Plan provides in section F.a., that Farm Credit will retain a lien on the personalty but only in the sum of $147,900 and "[u]pon payment of this $147,900 modified obligation, Farm Credit East shall release its UCC filings."

---

[18]The Plan does not mention Farm Credit's security interest in the 2008 tobacco crop although in the Debtors' attachment to Schedule B, Question 35 in the Enfield Shade case, ECF No. 6, it is described as secured by Farm Credit's lien. The crop has not been valued by the Court and the parties have not reported any agreement as to its value, although as noted earlier, Farm Credit claimed the crop to be worth $383,552 in at least one pleading, ECF No. 78 (Chickosky), but only worth an estimated $132,000 (22,000 pounds x $6.00 a pound) in another, ECF No. 89 (Chickosky).  The issue of the cross-collateralization aside, since Farm Credit has a security interest in the 2008 tobacco crop, to the extent the crop is consumed in the making of tobacco products for sale to customers or sold in bulk, Farm Credit's lien (which is not otherwise adequately protected) must extend to the cash proceeds of those sales until the claim is paid in full, and should be provided for in this or any future plan.  *See*, Bankruptcy Code §1225(a)(5)(B)(i); *In re Stallings*, 290 B.R. at 790. Because Farm Credit is undersecured, the Court's view of §1225(a)(5)(B)(i) in *In re Wilson*, 378 B.R. 862, 882 (Bankr. D.Mont. 2007) is not inconsistent.

Farm Credit objects to the elimination of the cross-collateralization.  The Debtors do not argue that the cross-collateralization is not properly provided for by the security agreements or is invalid under state law.[19]  Thus, the question before the Court is whether the Bankruptcy Code permits the Debtors through the plan confirmation process, to eliminate the cross-collateralization of the claims over the objection of the secured creditor while otherwise providing for the creditor to retain its individual liens on the collateral.  It is the Court's conclusion that Bankruptcy Code §1225(a)(5)(B)(i)[20] does not permit it to do so.

While Bankruptcy Code §1222(b)(2) does permit a Chapter 12 debtor to modify the rights of holders of secured claims, including altering the terms of repayment of debt, the debtor may do so, absent consent, only if, as required by §1225(a)(5)(B), the secured creditor both retains the lien securing the claim and is paid the present value of its claim. By eliminating Farm Credit's cross-collateralization, the Debtors are seeking to alter the lien in a way not permitted by the Code.[21]

The lien-retention requirement of §1225(a)(5)(B)(i) is construed strictly. . . .

_____

[19]Conn. Gen. Stat. §42a-9-204(a) and (c) authorize cross-collateralization clauses: "(a) Except as otherwise provided in subsection (b), [applicable to consumer goods] a security agreement may create or provide for a security interest in after-acquired collateral. . . . (c) A security agreement may provide that collateral secures . . . future advances or other value, whether or not the advances or value are given pursuant to commitment."  *See In re Beaudoin*, 427 B.R. 31, 42 (Bankr. D.Conn. 2010) ("'It is settled that [an after acquired property clause] is valid and that thereby the mortgage covers not only property then owned . . . but becomes a lien upon all property *subsequently acquired* by it which comes within the description on the mortgage.' *Central Trust Co. of New York v. Kneeland*, 138 U.S. 414, 419, 11 S.Ct. 357, 358, 34 L. Ed. 1014 (1891)."

[20]The section provides in relevant part, that "the court shall confirm a plan if –
* * *
(5) with respect to each allowed secured claim provided for by the plan –
* * *
            (B)(i) the plan provides that the holder of such claim retain the lien securing such claim;"

[21]The Court is not determining whether such an alteration would have been permitted had Farm Credit been oversecured, as opposed to undersecured.

24

Indeed, the overwhelming majority of courts have refused to modify or alter the lien retained pursuant to §1225(a)(5)(B)(i) in any way. *See, e.g., In re Clark*, 288 B.R. 237, 249-51 (Bankr. D.Kan. 2003) (finding that where Bank previously had a lien on both real estate and personalty, and plan proposed for Bank to retain lien only on real estate, the "treatment of the Bank's claim runs afoul of the lien retention requirement in §1225(a)(5)(B).").

*In re Heath*, 483 B.R. 708, 712-713 (Bankr. E.D. Ark. 2012).

The *Heath* court went on to state:

The Debtors argue that they can modify the secured claim under the plan, pursuant to 11 U.S.C. §1222(b)(2), to remove the cross-collateralization from the lien. The Court finds the Debtors' argument unpersuasive. Without question, §1222(b)(2) authorizes the Debtor to "modify the rights of holders of secured claims" through the plan. 11 U.S.C. §1222(b)(2). However, that authorization is limited to modifications that comply with the confirmation requirements of §1225. *In re Kerwin-White*, 109 B.R. 626, 629-30 (Bankr. D. Vt. 1990) ("Section 1222(b) is a general provision of Chapter 12 which merely states what plans may contain; it does not purport to override the specific limitations placed on it in §1225(a)(5)."). That is, section 1222(b)(2) sets the boundaries of how a debtor may treat a secured claim in a Chapter 12 plan; section 1225(a)(5) sets out requirements for how a debtor must treat a secured claim in a Chapter 12 plan. The authority to modify a secured claim under §1222(b)(2) does not supercede the lien-retention requirement of §1225(a)(5)(B)(i).

*Heath*, 483 B.R. at 712.

For these and other reasons set forth by the court in *Heath*, Court concurs with its holding that neither Bankruptcy Code §1222(b)(2) nor §1225(a)(5)(B)(i) authorize the Debtors to eliminate cross-collateralization through confirmation a Chapter 12 plan, over the objection of the secured creditor.

## IV. CONCLUSION

The Court concludes that the Plan is not feasible based upon the Debtors' past history of repeated financial losses, their failure to present sufficient and reliable evidence as to their postpetition revenues and expenses and their unrealistic projections for the

25

future.  Further, the Plan wrongfully proposes to eliminate the cross-collateralization of Farm Credit's secured debt in violation of Bankruptcy Code §1225(a)(5)(B)(i).  Therefore, because the Court finds that the present Plan cannot be confirmed, it is not necessary for the Court to resolve at this time Farm Credit's remaining objections, including its assertion that the period of time over which payments on the secured debt were to be made was too lengthy and the rate of interest too low.  In accordance with the above:

**IT IS HEREBY ORDERED** that confirmation of the Chickoskys' and Enfield Shade Tobacco LLC's Joint Second Amended Chapter 12 Plans are **DENIED**.

Dated: September 30, 2013                                        BY THE COURT


Albert S. Dabrowski
Chief United States Bankruptcy Judge

26